# UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

JOSEPH GULLO,

             **Plaintiff,**

-vs-                                          **Case No. 6:08-cv-1565-Orl-31KRS**

COMMISSIONER OF SOCIAL
SECURITY,

             **Defendant.**
_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

This cause came on for consideration without oral argument on the Complaint filed by

Joseph Gullo seeking review of the final decision of the Commissioner of Social Security denying

in part his claim for social security benefits. Doc. No. 1. The Commissioner answered the

Complaint and filed a certified copy of the record before the Social Security Administration (SSA).

Doc. Nos. 14, 21. The matter is now ripe for adjudication.

## I.      PROCEDURAL HISTORY.

Gullo applied for disability benefits under the Federal Old Age, Survivors and Disability

Insurance Programs (OASDI), 42 U.S.C. § 401, *et seq.*, and under the Supplemental Security

Income for the Aged, Blind, and Disabled Program (SSI), 42 U.S.C. § 1381, *et seq.* (sometimes

referred to herein as the Act). R. 68-70, 382-84. He originally alleged that he became disabled on

September 6, 2001, but he later amended the disability onset date to April 11, 2002. R. 64, 68.

Gullo's applications were denied initially and on reconsideration and by an ALJ. R. 18-24, 42-47, 374-81.

Gullo requested review of the ALJ's decision. R. 7. On January 27, 2006, the Appeals Council issued a decision finding no basis to review the ALJ's decision. R. 4-6. Gullo timely sought review of the decision by this Court. Doc. No. 1.

This Court reversed the decision of the Commissioner and remanded the case for further proceedings because it was not clear what weight the ALJ gave to the opinion of treating physician Antonio Canaan, M.D., and the basis of her conclusion that Gullo would have only moderate impairments in mental functioning in light of his global assessment of functioning (GAF) scores.[1] R. 445-68. The Appeals Council then vacated the decision of the Commissioner and remanded the case to an ALJ "for further proceedings consistent with the order of the court." R. 471.

The ALJ held a second hearing on March 3, 2008. Gullo, represented by a non-attorney representative, testified at the hearing. A vocational expert (VE) was also present at the hearing, but she did not testify. R. 523-29.

The ALJ then issued a second opinion. She concluded that Gullo was insured under OASDI through June 30, 2004. R. 426. He had not engaged in substantial gainful activity since the alleged amended onset date of disability. R. 427.

---

[1]  The Global Assessment of Functioning ("GAF") scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, or unable to care for himself). *Harold I. Kaplan, M.D. & Benjamin J. Sadock, M.D., Synopsis of Psychiatry* 299 (8th ed. 1998) (hereinafter *Synopsis of Psychiatry*). A GAF rating between 21 and 30 reflects: "Behavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (eg, sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (eg, stays in bed all day; no job, home, or friends)." *Id*. at 299.

He had hepatitis C, cirrhosis of the liver, degenerative disc disease of the lumbar spine, sleep apnea, obesity, and depression, which were severe impairments. These impairments did not meet or equal any listed impairments. R. 427.

The ALJ concluded that Gullo had the residual functional capacity (RFC) to perform light work except that he was limited to work involving simple, routine tasks. R. 429. In reaching this conclusion, she gave significant weight to the opinions of the reviewing physicians regarding Gullo's exertional limitations, finding them consistent with the assessment by Dr. Rosillo, a treating physician. R. 431.

With respect to Gullo's mental functional limitations, the ALJ discussed the evidence of record, including Gullo's GAF scores. She gave the GAF scores limited weight because they generally reflected Gullo's condition only at the moment of assessment, noting that Gullo had periods of "relative stability." R. 433-34. She also found that inconsistencies in information Gullo provided to treatment providers, and his inconsistent efforts to get mental health treatment, undermined his credibility. She gave significant weight to the opinions of reviewing physicians regarding Gullo's mental functional limitations. R. 434-35.

The ALJ found that Gullo could not return to his past relevant work. She relied on the Medical-Vocational Guidelines (the "Grids"), 20 C.F.R. Pt. 404, Subpt. P, App. 2, to determine that Gullo was disabled beginning April 10, 2007, the date he attained age 55. R. 435. She relied on the testimony of a VE at the original hearing to conclude that before that date there were light, unskilled jobs that Gullo could perform available in the national economy, specifically agricultural product sorter, silverware wrapper, and street cleaner. R. 436. Therefore, the ALJ concluded that Gullo was disabled as of April 10, 2007, but not earlier. R. 436.

Thereafter, Gullo filed the present case. He requests that the Court reverse the Commissioner's decision and remand the case for an award of benefits. Doc. No. 18.

## II.    JURISDICTION.

Plaintiff having exhausted his administrative remedies, the Court has jurisdiction pursuant to 42 U.S.C. § 405(g), as adopted by reference in 42 U.S.C. § 1383(c)(3).

## III.    STATEMENT OF FACTS.

The pertinent facts of record are set forth in the parties' memoranda and in the Court's previous decision. Therefore, I will only summarize the facts to protect Gullo's privacy to the extent possible.

### A.    *Gullo's Testimony.*

Gullo was born on April 11, 1952. R. 391. He completed the tenth grade and, while in the military, had special training in cooking. R. 392.

Gullo previously worked as a butcher at a supermarket. R. 393. He stopped working there in September 2001. *Id*. Before that, he worked in a warehouse as an order picker for approximately two months. R. 394. Gullo also worked as a cable wirer for six months, an electronic welder for two years, occasionally as a janitor over the course of fifteen years, and as a cook at various restaurants over twenty-five years. R. 394-96.

Gullo stopped working because of exhaustion and headaches caused by hepatitis C. R. 406.

Gullo testified that he had sleep apnea, high blood pressure, depression, cirrhosis of the liver, and hepatitis C. R. 396. He often felt fatigued. R. 396-97. In a typical night, he would sleep for a total of three to four hours. R. 399. After testing was performed relating to Gullo's

sleep apnea, he was prescribed a C-Pap machine, which he never purchased because he could not afford it. R. 400. He tried to take naps during the day. R. 401.

Gullo had constant pain due to the enlargement of his liver. R. 399. When his liver enlarged, it put pressure on his stomach, causing pain. *Id*. At times it was a stabbing pain, while at other times it felt like cramping. *Id*. He had previously taken interferon[2] for the hepatitis C, but he was taken off of it when he became suicidal. R. 404.

Gullo had pain in his lower back that radiated into his right leg down to his knee. R. 398. He testified that he experienced pain in his back "all the time," and that it prevented him from sitting for more than a short period of time. *Id*. When the pain radiated into his leg, it was either a shooting pain or it would cause his leg to go numb, which he described as his leg falling asleep. R. 396, 399.

Gullo had been prescribed medication, but he could not afford to purchase most of it. R. 403, 406. He did take medication for his high blood pressure. R. 404.

Gullo received treatment for his depression about once or twice a month. *Id*. He was once voluntarily admitted to a psychiatric facility because he was becoming depressed and thought he was going to use drugs or alcohol. R. 405. He admitted that he regularly burned himself because hurting himself made him feel better. *Id*. He had burned himself about ten to twelve times in the six to eight months preceding the hearing. R. 408.

---

[2] Interferon is a protein that fights viruses by regulating reproduction of cells, and regulating the immune system. Drugs.com, *interferon alfa-2a*, http://www.drugs.com/mtm/interferon-alfa-2a.html (last visited January 4, 2010).

Gullo testified that he could sit or stand for about ten minutes before needing to change positions. R. 401. He could tolerate walking for approximately two blocks before feeling exhausted. *Id*. He could not lift at all, not even a gallon of milk. R. 402.

Gullo could not do any of the household chores. *Id*. His son or his wife did all of the work around the house, including mopping, sweeping, and vacuuming. *Id*. Gullo was not involved in any social or recreational activities. *Id*. However, he did attend AA or NA meetings once or twice a month. R. 397-98. If Gullo's health prevented him from attending those meetings, an informal meeting was held at his house. R. 398, 403.

At times Gullo had difficulties taking care of his personal hygiene. R. 397. He could not bend over to put on his shoes or clothing. *Id*. When this occurred, his wife would help him dress. *Id*. Nevertheless, in an Office of Disability Determinations worksheet Gullo wrote that his condition did not affect his habits of bathing, hair care, and dressing, as long as he took his time. R. 98.

Gullo did not have a driver's license. R. 392. Gullo testified that he could not sit long enough to drive anyway. *Id*.

Gullo testified that he smoked five to six cigarettes a day. R. 397. He had not consumed alcohol or used an illegal drug since January 1998. *Id.*

At the supplemental hearing, Gullo testified that some days were worse than others. He took naps during the day because he did not sleep well due to sleep apnea. He continued to have pain in his back in the area of his liver. R. 527. He spent most of his days at home. He hoped to start a new treatment for his liver. R. 528.

-6-

*B.    VE's Testimony.*

The VE at the original hearing was asked to consider a hypothetical claimant of Gullo's age, education, and past relevant work.  R. 410.  This claimant could carry out simple instructions, perform routine tasks, and concentrate on simple tasks.  *Id.*  Additionally, the claimant could lift twenty pounds occasionally and ten pounds frequently, and sit, stand, or walk for six hours in an eight-hour day.  *Id.*  The VE responded that such an individual could not do Gullo's past work.  The VE opined that there were a number of jobs that the hypothetical claimant could perform that existed in significant numbers in the national economy.  *Id.*  Specifically, the jobs available would be agricultural product sorter, silverware wrapper, and street cleaner, all of which are unskilled, light duty positions.  *Id.*

The VE was next asked to consider that the hypothetical claimant, with the limitations above remaining constant, could understand, remember, and carry out simple routine instructions, but not detailed or lengthy instructions.  He could get along satisfactorily with others.  R. 411.  The VE responded that such an individual could still perform the positions listed above.  *Id.*

The VE was then asked to assume that the hypothetical claimant could perform simple, routine repetitive tasks, lift ten pounds, and stand or walk for six hours in an eight-hour day, with breaks every two hours and no limitations on sitting.  The VE responded that such an individual could perform the positions of table worker and bench hand, which are sedentary, unskilled positions that existed in significant numbers in the national economy.  R. 411.  The VE testified that the hypothetical claimant would not be able to perform skilled work.  R. 411-12.

Gullo's attorney then asked the VE to consider a hypothetical claimant of Gullo's age, education, and past relevant work, capable of sitting or standing for no more than ten minutes at a

time, walking a maximum of two blocks at a time, and lifting less than ten pounds. R. 412. The VE responded that such an individual could not perform any work. *Id.*

Lastly, Gullo's attorney asked the VE to consider the same hypothetical claimant with the exception that he now had mental impairments including depression, bipolar disorder, and manic or schizo affective disorder with a GAF score below 50.[3] R. 412-13. The VE responded that the claimant would probably be precluded from working. R. 413.

A VE was present at the supplemental hearing. R. 525. Neither the ALJ nor Gullo's attorney posed additional questions to the VE.

C.    *Medical Records.*

On April 27, 2000, Gullo was examined by Jacqueline Salcedo, M.D., at Sentara Bayside Hospital in Virginia. R. 130-31. A lab test showed that he was positive for hepatitis C. R. 153, 157. Gullo complained of having no energy and feeling fatigued. R. 131. Upon examination, Dr. Salcedo found Gullo to be comfortable and in no acute distress. *Id.* It was noted that his liver abnormalities could be secondary to his alcohol use. R. 130.

Dr. Salcedo performed an ultrasound guided liver biopsy on May 22, 2000. R.135. The biopsy revealed chronic hepatitis C with early cirrhosis. R. 129.

Gullo returned to Dr. Salcedo for a follow-up on October 20, 2000. Gullo reported feeling fairly well with some anxiety, for which Dr. Salcedo prescribed Ativan.[4] R. 128.

---

[3] A GAF score between 41 and 50 is defined as: "Serious symptoms (eg, suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (eg, no friends, unable to keep a job)." *Synopsis of Psychiatry* at 299.

[4] Ativan affects chemicals in the brain that may become unbalanced and cause anxiety and insomnia. Drugs.com, *Ativan*, http://www.drugs.com/mtm/ativan.html (last visited January 4, 2010).

Gullo was also seen by Robert E. Mitchell, M.D., on June 3, 2001. At that time, Gullo's chief complaint was "drinkin' and druggin' and depressed." R. 183. Gullo told Dr. Mitchell that he had discontinued the use of alcohol for approximately thirteen or fourteen months, but that he had again started using it about three or four months ago. R. 183. He had stopped using alcohol after he was diagnosed with cirrhosis and was told by a physician that he would die if he continued its use. *Id*. Gullo admitted that he continued to use drugs, primarily cocaine and crack cocaine. *Id*. He was also inflicting wounds on himself by burning his skin. *Id*. Dr. Mitchell observed that Gullo's insight and judgment were impaired. Gullo's mood was depressed, and he had suicidal thoughts. He sought hospitalization because he could not control his use of drugs and alcohol, and because he felt suicidal. R. 183-84. Dr. Mitchell's diagnosis was "substance abuse and dependence, alcohol and cocaine." R. 185. Gullo's GAF score at admission was 35,[5] but Dr. Mitchell opined that Gullo had had a GAF score of 50-55 in the previous year.[6] *Id*.

On June 3, 2001, Gullo was admitted to the Virginia Beach Psychiatric Center, where he was under the care of Dr. Mitchell. R. 178. He was detoxed from alcohol using the Librium detoxification protocol. R. 180. After his suicidal ideation subsided and his depression began to

---

[5]  A score between 31 and 40 is defined as: "Some impairment in reality testing or communication (eg, speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (eg, depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)." *Synopsis of Psychiatry* at 299.

[6]  A score between 51 and 60 is defined as: "Moderate symptoms (eg, flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (eg, few friends, conflicts with peers or coworkers)." *Synopsis of Psychiatry* at 299.

lift, he was discharged on June 6, 2001. R. 178, 180. His discharge diagnosis was substance abuse and dependence - alcohol and cocaine. R. 181. His discharge GAF score was 45. *Id.*

While he was hospitalized, Gullo was examined by Tom Jones, M.D. Gullo denied feeling fatigued or having headaches, shortness of breath, or insomnia. R. 186. Upon examination, Dr. Jones noted that Gullo had self-inflicted burns on both sides of his groin. R. 187.

In October 2001, Gullo participated in therapy at Lakeside Alternatives. R. 255-62. During intake, he reported having a depressed mood, insomnia, decreased energy, an inability to concentrate, problems with attention, and an increased appetite. R. 257. He was reported as being alert and coherent throughout the screening. R. 260.

On November 5, 2001, Gullo was examined by Arlene M. Palazzolo, M.D., at Lakepoint Family Medical Center. R. 287. Gullo complained of pain caused by his liver, as well as depression. *Id.* Gullo was prescribed Paxil for his depression and Vicodin for pain. *Id.*

On November 16, 2001, Gullo was taken to the Orlando Regional Medical Center emergency room and examined by a doctor whose signature is illegible. R. 198. Gullo had a headache around 8:00 a.m., prior to arriving at the hospital. *Id.* Around 2:00 p.m., he was riding a bus and felt dizzy, light headed, and weak, and then passed out. *Id.* Upon examination, Gullo reported he had general weakness, chest pain, shortness of breath, a headache, loss of consciousness, depression, and anxiety. *Id.* In the emergency room, Gullo did not appear to be in any distress. R. 198-99. He reported that he no longer had a headache. R. 199. A CT scan taken of Gullo's brain was normal. R. 207.

On November 23, 2001, Gullo returned to Dr. Palazzolo. R. 283. Gullo complained of pain in his liver and feeling like he was falling to the right side. *Id.*

On December 4, 2001, Gullo was referred by Dr. Palazzolo to Talal E. Hilal, M.D., for an evaluation of his hepatitis C. R. 164. Gullo complained of sharp pain and cramping lasting from five to fifteen minutes in the right upper quadrant of his abdomen, which he had been experiencing for the last five to ten years. *Id.* He also complained of fatigue and loss of balance. *Id.* Upon examination, Dr. Hilal noted that there was tenderness in Gullo's right lower and upper quadrants of the abdomen, and that his liver was approximately four centimeters enlarged. R. 163.

Gullo was examined by Francisco E. Rosillo, M.D., on December 17, 2001. R. 211. Gullo indicated that he was experiencing discomfort in the area of his liver, with nausea, and he was feeling very tired. *Id.* Gullo also indicated that he was experiencing depression, crying, insomnia, and had suicidal ideas. *Id.* Upon examination, Dr. Rosillo noted that Gullo had some tenderness on the right lower quadrant, and palpation of the liver showed that it had increased two finger breadths below the costal margin. R. 210. Dr. Rosillo described Gullo's mood as sad but alert. *Id.* He was coherent but his memory was impaired for recent events. *Id.* Dr. Rosillo's diagnosis was hepatitis C with cirrhosis of the liver, with a poor prognosis, and mild mental depression, with a fair prognosis. *Id.*

Dr. Rosillo assessed Gullo's functional ability. Dr. Rosillo concluded that Gullo could do light activity standing or walking for about six hours, with breaks every two hours during an eight-hour day. R. 209. He could be seated for six hours and did not have ambulation restrictions. *Id.* He could lift twenty pounds occasionally, and ten pounds frequently. *Id.*

On December 21, 2001, Gullo was examined by David J. Fleischmann, Ph.D, a licensed psychologist, at the request of the SSA. R. 214. At the time of the exam, Gullo stated that he was not taking any medication other than Vicodin on an as-needed basis. *Id.* In describing his

activities of daily living, Gullo stated that he woke up at approximately 3:00 a.m. or 4:00 a.m. each morning, drank a cup of coffee, and sat in a dark living room until 9:00 a.m. R. 213. After his wife left for work, he would sit outside until approximately 2:00 p.m., pondering his circumstances. *Id*. He would eat the lunch his wife had prepared for him and then lie in bed until his wife returned from work at 7:00 p.m. *Id*. He then would eat dinner with his wife, watch television in the bedroom, and try to go to sleep around 9:00 p.m. or 10:00 p.m. *Id*. He did not perform routine household chores. He did not have social contact except with family members. He left the house only for medical appointments. *Id*.

During the examination, Gullo described himself as depressed due to his drug history, family problems, and medical history. R. 213. His thought process was intact, but his attention/concentration was impaired. R. 212-13. His long-term memory was intact, and his speaking and thinking were logical and relevant. *Id*. Dr. Fleischmann's diagnosis was substance abuse and dependence in early remission, and dysthymic disorder.[7] Dr. Fleischmann assessed Gullo's GAF score at 45. R. 212.

On December 24, 2001, Gullo was seen by Mario J. Madruga, M.D., and Eric R. Stadler, M.D., at the emergency room of the Orlando Regional Medical Center. R. 215-28. Gullo complained of steady chest pressure, which he stated was about a five in intensity on a ten-point scale, shortness of breath, and a fainting episode (syncope). R. 215. An echocardiogram (ECG)

---

[7] A dysthymic disorder is a chronic mood disorder manifested as depression for most of the day, on more days than not, accompanied by poor appetite or overeating, insomnia, low energy, fatigue, low self esteem, poor concentration, and feelings of hopelessness. *Stedman's Medical Dictionary* 536 (26th ed. 1995) (hereinafter *Stedman's*).

was performed, but the results were not significant. *Id.* Gullo was released from the hospital the next day. *Id.*

Gullo saw Sherali H. Gowani, M.D., for a cardiac consultation on January 29, 2002. R. 315. For the previous month, Gullo had experienced mid sternal chest pain with a squeezing sensation that occurred intermittently. *Id.* He had also experienced shortness of breath and clamminess. *Id.* During one of these occurrences, he had a syncopal episode[8] that lasted two to three minutes. *Id.* Dr. Gowani conducted an EKG, which was within normal limits. R. 314.

On February 5, 2002, Gullo returned to Dr. Gowani complaining of dizziness. R. 323. A non-invasive cerebral vascular evaluation carotid and vertebral ultrasound study was performed. *Id.* Dr. Gowani noted that the test revealed that the internal carotid artery had mild atherosclerotic plaque, bilaterally, and that vertebral flow was antegrade, bilaterally. *Id.* On that same day, Gullo had an ECG. R. 322. The Echocardiography Report demonstrated that the aortic valve opening had thickened and calcified; otherwise, the report appeared to be normal. *Id.*

Gullo returned to Dr. Palazzolo on February 28, 2002. R. 279. He reported numbness in his right thigh and headaches. Dr. Palazzolo's impression was high blood pressure (HTN) and transient ischemic attack (TIA). *Id.*

In March 2002, Gullo was treated at the Lakepoint Family Medical Center for complaints of insomnia. R. 278. Later that month, he complained of stress. Dr. Palazzolo's impression included that Gullo had an anxiety disorder. R. 277. Gullo repeatedly complained of pain in the

---

[8] A syncopal episode is a "[l]oss of consciousness and postural tone caused by diminished cerebral blood flow." *Stedman's* at 1720.

-13-

area of his liver. *See, e.g.,* R. 268-69, 273, 276-77. In April 2002, he complained of being tired and sleeping too much. R. 270, 275.

On April 12, 2002, Gullo was examined by a doctor whose signature is illegible. R. 162. Gullo reported that he had epigastric pain and that he was always tired. *Id.*

Gullo returned to Dr. Gowani on May 3, 2002, complaining of chest and leg pain. R. 310. Dr. Gowani conducted a cardiolyte stress test, which revealed ischemia,[9] and an arterial duplex study, which revealed minimal peripheral vascular disease. *Id.*

On June 3, 2002, Gullo complained of shortness of breath and had chest x-rays performed. R. 288. William Gerhardt, M.D., found the x-rays to be unremarkable. *Id.*

Gullo returned to Dr. Gowani on June 4, 2002, at which time he had a right and left cardiac catheterization, right and left coronary angiogram, and left ventriculogram performed. R. 320. Dr. Gowani decided to perform the test because Gullo was experiencing chest pain. *Id.* The test revealed that Gullo's left ventricular cavity appeared normal and the left main, circumflex coronary artery and right coronary artery were free of disease, but the left anterior descending artery (LAD) had mildly distal atherosclerotic change and had become smaller. R. 317-18. Dr. Gowani recommended that Gullo stop smoking. R. 317.

On September 16, 2002, an MRI of the lumbar spine was performed. R. 290. Mark J. Timken, M.D., interpreted the MRI as revealing thoracolumbar levoscoliosis, loss of disc height and hydration with a disc bulge at L3-4 and L4-5, and L5-S1 facet arthropathy. R. 291.

---

[9] Ischemia is a condition where blood flow to the heart muscle is obstructed by a partial or complete blockage of a coronary artery. MayoClinic.com, *Coronary Artery Disease*, http://www.mayoclinic.com/health/cardiac-ischemia/HQ01646 (last visited January 4, 2010).

Gullo returned to the Lakepoint Family Medical Center on September 16, 2002, to get a referral for a sleep study.  R. 263.  He reported having a mini stroke on September 14, which may have been related to sleep apnea.  *Id.*  He continued to have pain in his liver and was tired and fatigued.  *Id.*

On September 23, 2002, Gullo had an MRI of his brain.  R. 292.  Dr. Timken interpreted the MRI as revealing mild biparietal atrophy.  *Id.*

Gullo returned to Dr. Gowani on September 24, 2002 complaining of sleep apnea.  R. 308. He stated that he had stopped breathing in his sleep for thirty second intervals, which caused him to wake up gasping.  *Id.*  As a result of this, during the day he was extremely fatigued.  *Id*.  Dr. Gowani recommended that Gullo undergo a sleep study, which was performed on October 30, 2002.  R. 307, 316.  As Dr. Gowani discussed with Gullo when he returned after undergoing the study, the study revealed severe obstructive sleep apnea and nocturnal hypoxemia.[10]  R. 306, 316, 508.

On November 6, 2002, Gullo was referred to Michael Harrell, Ph.D., by the SSA for a mental status evaluation.  R. 355.  At the examination, Gullo demonstrated a variable ability to remember recent and remote events with accuracy.  R. 354.  His thought process was generally logical with some mental confusion.  *Id.*  His mood was mildly depressed, but he did not show extremes of emotion.  *Id*.  He reported being fatigued and depressed, and having problems with daily activities.  *Id*.  Dr. Harrell's diagnosis was as follows: dysthymia; and alcohol and cocaine

---

[10] Hypoxemia is a "[s]ubnormal oxygenation of arterial blood[.]"  *Stedman's* at 841.

dependence, in remission. R. 353. Dr. Harrell's GAF assessment was 60, and he estimated that Gullo's GAF for the previous year was also 60. *Id*.

On November 12, 2002, Dr. Gowani examined Gullo for complaints of excessive fatigue and shortness of breath on exertion, and to follow up on the earlier sleep study. R. 306. Dr. Gowani's impressions included that Gullo had mild coronary artery disease, and sleep apnea for which a C-Pap study would be performed. R. 305-06.

On July 16, 2003, Gullo again sought treatment from Lakeside Alternatives and participated in an intake screening. R. 364. Gullo reported having depression, anxiety, general thoughts of homicide and suicide, poor attention span, poor concentration, and sleep disturbance. R. 364-69. The assessment specialist assessed Gullo's current GAF score as 45. R. 368.

Gullo was examined by Antonio Canaan, M.D., on September 17, 2003. R. 357. Gullo was referred to Dr. Canaan for evaluation and treatment of his depression and mood swings. *Id*. Gullo reported that he had not had his medication for six months, due to financial difficulties. *Id*. He stated that he was having mood swings ranging from euphoria to deep depression, accompanied by delusions of paranoia. *Id*. Gullo also reported burning himself with a hot pan. R. 358. Dr. Canaan's diagnosis was that Gullo suffered from bipolar disorder type I with psychotic features. *Id*. Dr. Cannan noted that Gullo's GAF was 25-30.[11] *Id*. He treated Gullo with medication. R. 359.

---

[11] A GAF rating between 21 and 30 reflects: "Behavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (eg, sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (eg, stays in bed all day; no job, home, or friends)." *Synopsis of Psychiatry* at 299.

In March 2004, Gullo sought treatment at a clinic for complaints of pain in the area of his liver, anxiety, and depression. R. 372.

On June 30, 2005, an ultrasound was performed of Gullo's abdomen that revealed splenomegaly (enlarged spleen). R. 509.

Radiologic tests performed in 2007 revealed marked degenerative disease at L5-S1 with some neural foraminal narrowing. R. 512, 518. Jaime Torner, M.D., noted that Gullo was, nevertheless, "doing well." R. 513.

Gullo returned to Lakeside Alternatives on February 23, 2008 complaining of voices in his head. R. 519. The evaluator, whose name is illegible, assessed Gullo's current GAF score to be 25. R. 521-22.

       *D.*     *Reviewing Professionals.*

       1.     <u>Physical Functional Capacity Assessments</u>.

Gloria B. Hankins, M.D., prepared a physical RFC assessment after reviewing Gullo's records in January 2002. 247-54. Dr. Hankins opined that Gullo could lift twenty pounds occasionally and ten pounds frequently. R. 248. He could sit, stand, or walk about six hours during an eight-hour workday, with no other functional limitations. R. 248-54.

In November 2002, Violet A. Stone, M.D., completed a physical RFC assessment after reviewing Gullo's medical records. R. 327-34. She opined that Gullo could lift up to twenty pounds occasionally and ten pounds frequently. R. 328. He could sit, stand, or walk for about six hours in an eight-hour workday, with no other functional limitations. R. 328-34.

2.      <u>Mental Functional Capacity Assessments</u>.

Ann J. Adams, Psy.D., a licensed psychologist, completed a Mental Residual Functional Capacity Assessment and a Psychiatric Review Technique form after reviewing Gullo's records in January 2002. R. 229-46. Dr. Adams opined that Gullo had a dysthymic disorder and a substance abuse and dependence disorder in early remission. R. 236, 241. She concluded that Gullo would have mild limitations in activities of daily living, and moderate limitations maintaining social functioning, concentration, persistence, or pace. R. 243. Gullo would likely have one episode of decompensation of extended duration. *Id*. Dr. Adams further opined that Gullo would have moderate limitations in understanding, remembering, and carrying out detailed instructions, maintaining attention and concentration for extended periods, and completing a normal workday and workweek without interruptions from psychologically based symptoms. R. 229-30.

In November 2002, Jeffrey L. Prickett, Psy.D., completed a Psychiatric Review Technique form and Mental Residual Functional Capacity Assessment after reviewing Gullo's records. R. 335-52. Dr. Prickett opined that Gullo had a dysthymia and substance addiction disorder. R. 335. Prickett concluded that Gullo would have mild limitations in maintaining social functioning, and moderate limitations in activities of daily living and maintaining concentration, persistence, or pace. R. 345. Prickett further opined that Gullo would be moderately limited in his ability to carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, and complete a normal workday and workweek without interruptions from psychologically based symptoms. R. 349-50.

## IV.    STANDARD OF REVIEW.

To be entitled to disability benefits under OASDI or SSI, a claimant must be unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  A "physical or mental impairment" under the terms of the Act is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).  In a case seeking disability benefits under OASDI, the claimant also must show that he or she became disabled before his or her insured status expired in order to be entitled to disability benefits.  42 U.S.C. § 423(c)(1); *Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir. 1979).

Pursuant to 42 U.S.C. § 405(a), the SSA has promulgated a five-step inquiry that must be followed in determining whether a claimant is entitled to benefits.  In sum, an ALJ must apply the following criteria, in sequence:

(1) Is the claimant presently unemployed?

(2) Is the claimant's impairment severe?

(3) Does the claimant's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1?

(4) Is the claimant unable to perform his or her former occupation?

(5) Is the claimant unable to perform any other work within the economy?

20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  An affirmative answer to any of the above questions leads to either the next question, or, on steps three and five, to a finding of disability.  A negative

-19-

answer leads to a finding of "not disabled." *See, e.g., McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986) (per curiam).

"The burden is primarily on the claimant to prove that he is disabled, and therefore entitled to receive Social Security disability benefits." *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001) (citing 20 C.F.R. § 404.1512(a)). However, "the burden temporarily shifts at step five to the Commissioner[,] . . . [who] must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform." *Id.* at 1278 n.2 (citing *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999)).

A court's review of a final decision by the SSA is limited to determining whether the ALJ's factual findings are supported by substantial evidence, *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005), and whether the ALJ applied the correct legal standards, *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988).

The SSA's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g); *Dyer*, 395 F.3d at 1210. "Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Walden v. Schweiker*, 672 F.2d 835, 838-39 (11th Cir. 1982)(internal quotations omitted).

The court "must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [SSA's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). Where the SSA's decision is supported by substantial evidence, the court will affirm, even if the court finds that the proof preponderates against the decision. *Dyer*, 395 F.3d at 1210. The court may not reweigh the evidence or substitute its own judgment. *Id.*

While there is a presumption in favor of the SSA's findings of fact, no such presumption attaches to the ALJ's legal conclusion about the proper standards to be applied in evaluating claims. *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988). Therefore, the court will reverse if the SSA incorrectly applied the law, or if the decision fails to provide the court with sufficient reasoning to determine that the SSA properly applied the law. *Keeton v. Dep't of Health & Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994) (citing *Cornelius v. Sullivan*, 936 F.2d 1143, 1146 (11th Cir. 1991)).

When reviewing a final decision issued by the SSA, the court is authorized to "enter . . . a judgment affirming, modifying, or reversing the decision . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

## V.   ANALYSIS.

Gullo asserts that the ALJ erred by relying exclusively on the Grids to determine that he was not disabled before April 10, 2007 rather than taking testimony from the VE at the supplemental hearing. He contends that the ALJ erred by not providing specific reasons for rejecting the opinions of treating physicians with respect to Gullo's GAF scores, and by giving weight to the opinions of the reviewing physicians rather than the GAF assessments by treating professionals. These are the only issues subject to review.[12]

A.    *The Step Five Evaluation.*

Gullo argues that when, as here, the ALJ found nonexertional impairments limited the ability to do the full range of light work, it was error for the ALJ to rely exclusively on the Grids at

---

[12] The parties were advised that issues not specifically raised would be waived. Doc. No. 15 at 2.

step five of the sequential evaluation. Gullo's argument is correct with respect to the law, but incorrect with respect to the basis of the ALJ's conclusion.

The ALJ specifically stated that she relied on the testimony of the VE at the original hearing in making the determination that Gullo could perform work available in the national economy. R. 436. During the initial hearing, the ALJ asked the VE to assume an individual who could perform the exertional demands of light work and would be limited to carrying out simple instructions, perform routine tasks, and concentrate on simple tasks. This hypothetical sets forth all of the functional limitations in the RFC established on remand. The VE responded that this hypothetical individual could perform the jobs of agricultural product sorter, silverware wrapper, and street cleaner. Therefore, this assignment of error is unavailing.

      *B.*    *Mental Functional Limitations.*

Gullo contends that the ALJ did not follow the Court's instructions to determine what weight to give to the GAF scores in the record. The ALJ's decision contains a detailed review of the GAF scores, the weight the ALJ gave to them, and the reasons for the weight given to the scores. *See* R. 433-34. The facts cited by the ALJ to support her decision to give limited weight to the GAF scores are supported by evidence in the record. Thus, the ALJ precisely complied with the instructions from the Court.

Gullo also asserts that the ALJ erred by giving significant weight to the opinions of reviewing physicians rather than treating physicians. He does not identify, however, the opinions of treating or examining physicians that he contends establish that his mental functional capacity was more limited than the ALJ determined it to be. Gullo has not cited, and the Court has not found, any opinions from treating or examining psychiatrists or psychologists that reflect that

-22-

Gullo could not perform simple, routine work. When, as here, there is no demonstrated conflict between the functional capacity assessment rendered by reviewing physicians and the opinions of treating and examining professionals, the ALJ did not err in giving significant weight to the reviewing professionals' RFC assessments. *Cf.* 20 C.F.R. §§ 404.1527(f)(2)(i), 416.927(f)(2) ("State agency medical and psychological consultants . . . are highly qualified physicians and psychologists who are also experts in Social Security disability evaluation.").

Accordingly, this assignment of error is also unavailing.

**VI.     RECOMMENDATION.**

For the reasons set forth herein, it is **RESPECTFULLY RECOMMENDED** that the decision of the Commissioner be **AFFIRMED**. It is further recommended that after the Court issues its ruling on this Report and Recommendation, it direct the Clerk of Court to issue a judgment and close the file.

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

**Recommended** in Orlando, Florida on January 5, 2010.

*Karla R. Spaulding*
_____
KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:
Presiding District Judge
Counsel of Record
Unrepresented Parties
Courtroom Deputy